WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
Mark C. Rifkin (MR-0904)
Alexander H. Schmidt (AS-8304)
Martin E. Restituyo (MR-0856)
270 Madison Avenue
New York, New York 10016
(212) 545-4600
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HERBERT H. KLIEGERMAN, on behalf of himself and others similarly situated, | 07-cv-08404-PKC |
| Plaintiff, | |
| - against - | **AMENDED CLASS ACTION COMPLAINT** |
| APPLE, INC. and AT&T MOBILITY, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Herbert H. Kliegerman, by his undersigned attorneys, for this amended class action complaint, alleges upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of counsel, as follows:

## NATURE OF ACTION

1.    This is an antitrust class action pursuant to section 2 of the Sherman Act, a consumer class action brought pursuant to the laws of 43 states and the District of Columbia,[1] and a breach of warranty class action pursuant to the federal Magnuson-Moss Warranty Act, brought by Plaintiff on his own behalf and on behalf of classes of persons similarly situated, those being persons who purchased an Apple iPhone from either Defendant between June 29, 2007 (or the actual date that the iPhone became available) through the date of trial of this action.

---

[1] The state consumer protection statutes being sued upon are identified at ¶ 129 n.5 below.

A.    **Summary of Material Facts**

2.    Defendant Apple, Inc. ("Apple") launched its iPhone on or about June 29, 2007. Prior to launch, Apple entered into an exclusive five-year contract with Defendant AT&T Mobility, LLC ("AT&T") that establishes AT&T as the exclusive provider of cell phone voice and data services for iPhone customers through 2012. As part of the contract, Apple shares in AT&T's revenues and profits.

3.    To enforce AT&T's exclusivity, Apple, among other things, programmed and installed software locks on each iPhone it sold that prevented the purchaser from switching to another carrier that competes with AT&T to provide cell phone voice and data services. Under an exemption to the Digital Millennium Copyright Act of 1998, cell phone consumers have an absolute legal right to modify their phones to use the network of their carrier of choice. Defendants have unlawfully prevented iPhone customers from exercising that legal right by locking the iPhones and refusing to give customers the software codes needed to unlock them. Among other injurious effects, iPhone consumers have been unable to switch to local carriers while traveling abroad and have consequently been forced to pay exorbitant roaming charges – amounting to thousands of dollars per trip – to Defendants. Through their refusal to unlock the iPhones, Defendants have unlawfully stifled competition, reduced output and consumer choice, and artificially increased prices in the aftermarket for iPhone voice and data services.

4.    Under its agreement with AT&T, Apple retained exclusive control over the design, features and operating software for the iPhone. To enhance its iPhone related revenues, Apple has created a number of software programs called "applications," such as ring tone, instant messaging and photography enabling software, that can be downloaded and used by iPhone owners. Apple has also entered into agreements with other software manufacturers by which

2

Apple "approves" their software applications for iPhone use in exchange for a share of the manufacturer's resulting revenues. Apple refuses to "approve" any application in which Apple has no financial interest. Apple also unlawfully discourages iPhone customers from downloading competing application software by telling customers that Apple will void and refuse to honor the iPhone warranty of any customer who has downloaded competing applications. Through these actions, Apple has unlawfully stifled competition, reduced output and consumer choice, and artificially increased prices in the aftermarket for iPhone software applications.[2]

5.    In an act that can only be described as reprehensible and unconscionable as well as illegal, Apple retaliated against and punished consumers who had exercised their legal right to unlock their iPhone or who had installed software applications that competed with Apple's. On September 27, 2007, under the guise of issuing an "upgraded" version of the iPhone operating software, Apple issued a software update in which Apple had secretly embedded malicious codes designed to "brick" (that, is, render completely inoperable) or otherwise damage the iPhones of any consumer that had unlocked the iPhone or downloaded competing applications.

6.    When iPhone owners took their damaged phones to Apple or AT&T for repair or replacement, they were unlawfully told that they had breached their warranty agreements by unlocking their phone or downloading unapproved software and that their only remedy was to buy a new iPhone. Because Apple had deliberately damaged or destroyed their iPhones, Apple and AT&T were obligated by law to honor their warranties and repair or replace the phones.

---

[2] Apple has recently announced that it intends to permit use of iPhone applications created by independent software developers in February 2008.

B.    **Summary of Claims**

7.    In pursuit and furtherance of their unlawful anticompetitive activities, Apple and AT&T engaged in numerous breaches of warranty under the Magnuson-Moss Warranty Act ("MMWA") and unlawful deceptive acts or practices within the meaning, of the consumer protection laws at issue because they (a) failed to disclose to consumers that the iPhone's operating software contained codes that "locked" the iPhones to only accept AT&T Subscriber Identity Modules ("SIM cards"), thereby preventing iPhone purchasers from using any cell phone voice and data service provider other than AT&T (with which Apple shares revenues); (b) failed to disclose to consumers that the "unlock code" that would enable consumers to use a service other than AT&T would not be provided to iPhone owners, even though AT&T routinely provides such unlock codes for other types of cell phones; (c) failed to disclose to consumers that Apple would seek to prohibit iPhone owners from downloading programs or applications other than those "approved" by, and which generated revenue for, Apple (collectively, "Third Party Apps") and (d) failed to disclose to consumers that iPhone owners would incur excessive and unconscionable roaming fees – often several thousands of dollars – simply for carrying the iPhone with them while traveling internationally, even if they did not actively use the iPhone's data features during their trip.

8.    Apple also engaged in breaches of warranty under the MMWA and deceptive acts or practices, and committed trespass, when, on or about September 27, 2007, it released an update of its iPhone operating software ("Version 1.1.1") without disclosing to consumers that Apple had embedded malicious codes within the upgrade that would cause to malfunction or "brick" (a) any iPhone that had been "unlocked" to enable use of a non-AT&T provider's voice or data services; or (b) any iPhone on which the owner had installed Third Party Apps.

4

9.      Apple and AT&T further breached their warranties and engaged in deceptive acts or practices by refusing to repair or replace iPhones that had been destroyed when their owners downloaded Apple's malicious "upgraded" operating system.

10.      Apple and AT&T violated section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing or attempting to monopolize the aftermarket for voice and data services and software applications for iPhones in a manner that harmed competition and injured consumers by reducing output and increasing prices for those aftermarket services and applications.

11.      Apple and AT&T also violated section 2 of the Sherman Act, 15 U.S.C. § 2, by conspiring to monopolize the aftermarket for iPhone voice and data services.

12.      Plaintiff seeks declaratory and injunctive relief, treble and exemplary damages, costs and attorneys' fees. As for equitable relief, Plaintiff seeks an order: (i) requiring Defendant Apple to issue a corrected or upgraded version of its operating software that eliminates the malicious iPhone-destroying codes in its current Version 1.1.1 operating system; (ii) requiring Defendants to repair or replace, at no cost to the consumer, all iPhones rendered inoperable upon downloading Apple's Version 1.1.1 operating system; (iii) restraining Defendants from selling iPhones that are programmed in any way to prevent or hinder consumers from unlocking their SIM card or from downloading Third Party Apps; (iv) requiring Defendants to provide the iPhone SIM unlock codes to members of the class immediately upon request; (v) restraining Defendants from selling locked iPhones without adequately disclosing the fact that they are locked to work only with AT&T SIM cards; (vi) requiring Defendants adequately to disclose the fact that iPhone owners may incur excessive data roaming charges while traveling internationally; and (vii) requiring Defendant Apple to permit consumers to download Third Party Apps on their iPhones.

5

## THE PARTIES

13.    Plaintiff, Herbert H. Kliegerman (the "Plaintiff") is a 68 year-old individual residing in New York, New York, who purchased three iPhones and an AT&T voice and data service plan for the iPhones.

14.    Defendant Apple is a California corporation with a principal place of business located at 1 Infinite Loop, Cupertino, California 95014. Apple regularly conducts and transacts business in this District, as well as elsewhere throughout New York and the United States. Apple manufactures, markets and sells the iPhone, among other consumer electronic devices.

15.    Defendant AT&T is a Delaware limited liability company with a principal place of business located at 5565 Glenridge Connector, Atlanta, Georgia 30349. AT&T is a cell phone service provider that regularly conducts and transacts business in this District, as well as elsewhere throughout New York and the United States. AT&T markets and sells the iPhone and, pursuant to a written agreement with Apple, is the exclusive provider of wire and data services to iPhone customers.

## JURISDICTION AND VENUE

16.    This Court has federal question jurisdiction pursuant to the Sherman Antitrust Act, 15 U.S.C. § 2, the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337, and it has supplemental jurisdiction over the state law and Magnuson-Moss Warranty Act claims pursuant to 28 U.S.C. § 1367.

17.    This Court also has jurisdiction pursuant to 28 U.S.C. §1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, and there are 100 or more members of each of the two proposed Plaintiff Classes.

6

18.    Venue is proper in this District pursuant to 28 U.S.C. §1391 because Plaintiff purchased three iPhones in this District and a substantial part of the events or omissions giving rise to his claims occurred here, and because both Defendants are corporations subject to personal jurisdiction in this District and therefore reside here for venue purposes.

## FACTUAL ALLEGATIONS

**A.    Plaintiff's Injuries**

19.    In Spring 2007, Apple began a massive advertising campaign to market their new wireless communication device, the iPhone. The iPhone was and is advertised as a mobile phone, iPod and "breakthrough" Internet communications device with desktop-class email, an "industry first" "visual voicemail," web browsing, maps and searching capability.

20.    The iPhone debuted on June 29, 2007, and despite its hefty $499 or $599 price tag,[3] consumers waited in line to get their hands on one.

21.    Pursuant to an agreement between Defendants described more fully below, during the class period the iPhone has been sold at both Apple's and AT&T's retail and online stores.

22.    Apple and AT&T entered into a multi-year exclusive service provider agreement, which on information and belief expires in 2012, pursuant to which iPhone purchasers who want wireless voice and data services must sign a two-year service contract with AT&T.

23.    On or about July 7, 2007, Plaintiff Kliegerman purchased three 8GB iPhones at the Apple store on Prince Street in New York City for $599 each. Plaintiff also executed a two-year contract with AT&T for provision of wireless voice and data services.

---

[3] Initially the 4GB iPhone retailed for $499 and the 8GB iPhone retailed for $599. Apple and AT&T now sell only the 8GB version for $399.

24.    Prior to purchasing the three iPhones and executing the service contract, the Defendants did not adequately disclose to Plaintiff Kliegerman that his phones were locked to only work with AT&T SIM cards or that the unlock codes would not be provided to him.

25.    Prior to purchasing the three iPhones and executing the service contract, Defendants did not adequately disclose to Plaintiff Kliegerman that he would incur excessive and unconscionable roaming fees for using the data features of the iPhone while traveling internationally.

26.    In fact, Apple states on its website that "[y]ou can browse the Internet and send emails as often as you like without being charged extra."

27.    On July 16, 2007, Plaintiff Kliegerman took an iPhone to Mexico while on vacation and used it in Mexico to check emails and surf the Internet.

28.    Upon returning home after seven days in Mexico, Plaintiff Kliegerman received a bill from AT&T, and to his astonishment AT&T charged him $2,000 in international data roaming fees for using his iPhone while in Mexico.[4]

29.    Because Plaintiff Kliegerman is a frequent international traveler, Plaintiff has desired to purchase a SIM card from a foreign wireless carrier which would allow him to utilize its voice and data networks for approximately $25 plus local service fees that are substantially less than the $2,000 international data roaming fees charged by AT&T.

30.    Unbeknownst to Plaintiff Kliegerman, his iPhones were locked so that they cannot be used with a non-AT&T SIM card while traveling abroad.

---

[4] After Plaintiff contacted AT&T, a representative from AT&T credited the Plaintiff's account $1,500 despite the fact that the Plaintiff requested the entire $2,000 be credited.

31.     Plaintiff Kliegerman contacted both Apple and AT&T to obtain the unlock codes for his iPhones and was informed that the unlock codes would not be provided to him.

32.     On information and belief, AT&T provides unlock codes for non-iPhone phones if requested by a consumer.

33.     Plaintiff Kliegerman will continue to incur excessive voice and data roaming charges while traveling internationally unless the Defendant provides the Plaintiff with the codes to unlock his iPhones to accept non-AT&T SIM cards.

34.     Plaintiff Kliegerman downloaded Apple's Version 1.1.1 operating system on two of his iPhones, since he has paid for and is entitled to utilize Apple's software updates. Plaintiff has declined to download Third Party Apps or to unlock his SIM card because he is fearful that Apple's imbedded malicious codes in the update will damage or permanently disable his iPhones if he does so.

**B.     The Cell Phone Industry**

35.     Cellular telephone service began to be offered to consumers in 1983. Cellular telephones operate using radio frequency channels allocated by the Federal Communications Commission ("FCC"). Geographical service areas, sometimes known as "cells," are serviced by base stations using low-power radio telephone equipment, sometimes known as "cell towers." The cell towers connect to a Mobile Telephone Switching Office ("MTSO"), which controls the switching between cell phones and land line phones, accessed through the public-switched telephone network, and to other cell telephones.

36.     In cellular service there are two main competing network technologies: Global System for Mobile Communications ("GSM") and Code Division Multiple Access ("CDMA"), each of which has advantages and disadvantages that might appeal to or be rejected by individual

consumers. GSM is the product of an international organization founded in 1987 dedicated to providing, developing, and overseeing the worldwide wireless standard of GSM. CDMA has been a dominant network standard for North America and parts of Asia.

37.    To respond to the need for cellular phones that can also send and receive emails, streaming video and provide other services requiring higher data transfer speeds, technologies have been adopted by both CDMA and GSM carriers to comply with what the industry refers to as "3rd generation" technologies, or "3G" standards. Those technologies require the cell phone to be operating on a separate 3G network. The AT&T services provided to iPhone users described below is on AT&T's 2G network, not its 3G network.

38.    While there are a number of cellular phone service providers in the United States, only four have substantial national networks: AT&T, T-Mobile USA, Inc. ("T-Mobile"), Sprint Corporation ("Sprint"), and Cellco Partnership d/b/a/ Verizon Wireless ("Verizon") (collectively, the "Major Carriers"). Other suppliers may in effect be "resellers" of cellular telephone service which they purchase from the Major Carriers. AT&T and T-Mobile are the two GSM Major Carriers; Sprint and Verizon are the two CDMA Major Carriers.

39.    AT&T and the other wireless carriers have long dominated and controlled the cell phone industry in the United States in a manner that, according to a recent *Wall Street Journal* article, "severely limits consumer choice, stifles innovation, crushes entrepreneurship, and has made the U.S. the laughingstock of the mobile-technology world, just as the cellphone is morphing into a powerful hand-held computer." Walter S. Mossberg, "Free My Phone," *WSJ*, at R3, col. 1 (Oct. 22, 2007).

40.    Unlike the personal computer market in general – where computer manufacturers and software developers can offer products directly to consumers without having to gain the

approval of Internet service providers, and without paying those providers a penny – the wireless carriers have used their ability to grant or deny access to their wireless networks to control both the type of cell phone hardware and software that can be manufactured, and to extract payments from manufacturers granted access to their networks and customers. *Id.*

41.    The anticompetitive nature of the wireless telephone market the carriers have created facilitated and gave rise to the commercial context in which Apple and AT&T were able to commit the wrongs and offenses alleged herein.

## C.    The Cell Phone Industry's History of Misusing Locked SIM Cards

42.    In the United States, as a general rule only GSM phones use SIM (Subscriber Identity Module) cards. The removable SIM card allows phones to be instantly activated, interchanged, swapped out and upgraded, all without carrier intervention. The SIM itself is tied to the network, rather than the actual phone. Phones that are SIM card-enabled generally can be used with any GSM carrier.

43.    Thus, the hardware of all GSM compatible cell phones give consumers some degree of choice to switch among GSM carriers' wireless networks by enabling them to replace their SIM card, a process that the average individual consumer easily can do with no training by following a few simple instructions in a matter of minutes. SIM cards are very inexpensive, often in the $25 range. When the card is changed to the SIM card of another carrier, the cell phone is immediately usable on the other carrier's network. To switch from AT&T to T-Mobile, or the other way around, all that is required is this simple change of the SIM card.

44.    For telephone users who travel, particularly to Europe, the ability to change SIM cards to a European carrier such as Orange, Vodephone or TIM, allows the user of a GSM American phone to "convert it" to a "local" phone in the country where they have traveled.

11

Absent a conversion to local service, a consumer using an American GSM cell phone abroad must pay both for the American service and for "roaming" charges, that is, the right to call or retrieve data from outside of the customer's primary calling area. Roaming charges are typically very high, often a dollar or more a minute. As a result, U.S.-based cell phone users traveling abroad can yield very substantial savings by switching the SIM card and paying for local service rather than using the U.S.-based GSM carrier.

45.     In an effort to minimize consumers' ability to switch carriers or avoid roaming charges by simply switching SIM cards, the Major Carriers, acting in concert through trade associations and standards setting organizations such as the CDMA Development Group, the Telecommunications Industry Association, the Third Generation Partnership Project, the Alliance for Telecommunications, the Open Mobile Alliance, the CSM Association, the Universal Wireless Communications Consortium, and the Cellular Telephone Industry Association, and otherwise, agreed to implement "Programming Lock" features which effectively "locked" individual handsets so that they could not be used without the "locking" code. The carriers obtained a locking code (normally only six digits long) unique to each cell phone from the cell phone manufacturer and, at least initially, refused to disclose the code to consumers. That meant that a consumer who purchased a telephone manufactured to work with one of the Major Carriers could not switch to another carrier, even temporarily, such as while traveling abroad, without buying an entirely new phone.

46.     In particular, the GSM carriers, AT&T and T-Mobile, adopted a SIM Lock standard, which locked a GSM phone to a particular SIM card, thereby preventing consumers from simply changing their SIM cards. However, throughout the class period both T-Mobile and AT&T typically unlocked SIM cards on request for international travel or even if customers

wanted to cancel their accounts and switch to another carrier. In most cases, the unlock code was given on request, almost instantly, over the telephone.

47.    Accordingly, AT&T will now unlock SIM cards on telephones sold only through them, such as the Blackberry Pearl and the Samsung Blackjack. There is one exception: the iPhone. AT&T will not provide the unlock code for the iPhone for international travel or otherwise. On information and belief, that is because, as described more fully below, AT&T and Apple unlawfully agreed that the iPhone would not be unlocked under any circumstances.

**D.    Apple's Misuse of Other Locked Program Codes**

48.    The iPhone operating system also contains "security measures" which are, in effect, Program Locks designed to restrict the consumer from using programs or services on the iPhone other than those sanctioned by, and which generate revenue for, Apple. By design, Apple initially programmed the iPhone in a manner that prevented iPhone purchasers from downloading any "Third Party Apps" offered by software manufacturers who did not share their revenues with Apple.

49.    However, because of the design of the Apple operating system, which is based on the widely available Unix platform, Apple's initial efforts to eliminate Third Party Apps and to prevent iPhone customers from unlocking their SIM cards were ineffective, as clever consumers and Third Party programmers quickly circumvented Apple's locking codes and made both "unlocked" iPhones and "unlocking" software for iPhones available for sale on the Internet.

50.    As described below, in September 2007 Apple viciously retaliated against iPhone purchasers who utilized these unlocking features by issuing an iPhone operating system "upgrade" that was designed to damage or destroy any iPhone that had been or might later be unlocked or on which any Third Party App had been or might later be installed.

**E.    Defendants Know they Cannot Legally Prevent Consumers from Unlocking iPhones**

51.    Over the past few years, the Major Carriers were subject to lawsuits that sought to impose liability based on the existence of Program Locks. Carriers had claimed that Program Locks were necessary to protect their copyrighted intellectual property and claimed then, as Defendants do publicly now, that the reason for the locks was to benefit consumers and protect against fraud. Carriers had also sought to assert that under the terms of the Digital Millennium Copyright Act, 17 U.S.C. §1201, et. seq. ("DMCA"), disabling the Program Locks or unlocking a SIM card would be a violation of law.

52.    The DMCA was enacted in 1998 to prohibit third parties from circumventing technological measures (called "access controls") that copyright owners had employed to control access to their protected intellectual property. However, in November 2006, the Librarian of Congress, who by statute has authority to create exemptions to the restrictions in § 1201 of the DMCA to ensure the public is able to engage in noninfringing uses of copyrighted works, announced a three-year exemption from the prohibition against circumvention of access controls for "Computer programs in the form of firmware that enable wireless telephone handsets to connect to a wireless telephone communication network, when circumvention is accomplished for the sole purpose of lawfully connecting to a wireless telephone communication network." The exemption stemmed for a recommendation by the Register of Copyrights, which concluded that "the access controls [on cell phones] do not appear to actually be deployed in order to protect the interests of the copyright owner or the value or integrity of the copyrighted work; rather, *they are used by wireless carriers to limit the ability of subscribers to switch to other carriers, a business decision that has nothing whatsoever to do with the interests protected by copyright*." 71 Fed. Reg. 68472, 68476 (Nov. 27, 2006).

14

53.    Because Defendants were unable to enforce their Program Locks through legal means, they embarked on a scheme to enforce them unlawfully as to the iPhone.

**F.    The Apple – AT&T Exclusivity Agreement**

54.    On January 9, 2007, a little over a month after the adverse Librarian of Congress ruling, Apple announced that it had entered into an exclusive agreement making AT&T the only authorized provider of wireless voice and data services for iPhones in the United States.

55.    While the terms of Defendants' exclusivity agreement and any related agreements (collectively, the "Agreement") have not been made public, some details have leaked out in the press. First, AT&T and Apple agreed to share AT&T's voice service and data service revenue received from iPhone customers.

56.    Second, while AT&T offers iPhone purchasers a two-year contract, Apple agreed to give AT&T iPhone exclusivity for five years, so that iPhone customers whose initial service contracts expire before June 29, 2012 would have no choice but to renew with AT&T.

57.    Third, on information and belief, Apple and AT&T agreed to enforce AT&T's exclusivity by installing SIM card Program Locks on all iPhones and agreeing never to disclose the unlock codes to iPhone consumers who wished to replace the iPhone SIM card, either for international travel or to lawfully cancel their AT&T contract to switch to another carrier.

58.    Fourth, the Agreement allows Apple to control the features, content, software programming and design of the iPhone.

59.    Fifth, since both Apple and AT&T recognized that the iPhone would create a unique product for which consumers would pay a premium price compared to other cell phones, the pricing structure of the AT&T exclusivity deal was different from a typical agreement between a carrier and a handset manufacturer. Typically, the carrier subsidizes the purchase price

15

of the handset (that is, sells the cell phone to the consumer at a substantial discount off the list price) in return for the consumer entering into a service agreement with the carrier. This arrangement, the carriers argue, benefits the consumer by lowering the cell phone's price. The carriers, however, charge an early termination fee if consumers wish to cancel their service contracts mid-term, which fee the carriers argue is justified by their subsidization of the cell phone price. Upon termination, the cell phone customer can go to any carrier.

60.    In the Agreement, AT&T did not agree to subsidize the purchase of the handset but nevertheless still charges iPhone consumers a $175 early termination fee for each telephone number linked to the service plan. The early termination fee by AT&T is not justifiable absent subsidization of the handset price.

61.    Sixth, on information and belief, AT&T and Apple agreed that they would take action, legal or otherwise, to prevent users from circumventing the Program Locks and SIM card locks. A central purpose of this agreement was to suppress lawful competition domestically by T-Mobile against AT&T in the iPhone aftermarket for voice and data services, and by Third Party Application developers against Apple in the iPhone aftermarket for other applications.

62.    Finally, on information and belief, Defendants agreed Apple would be restrained for a period of time from developing a CDMA version of the iPhone to suppress competition by Sprint and Verizon. Defendants agreed to this restraint notwithstanding that Apple could easily develop an iPhone for use on CDMA networks. In fact, Apple originally approached CDMA carrier Verizon to be the iPhone exclusive service provider before Apple approached AT&T.

63.    The blatantly anticompetitive features of the Defendants' Agreement caused one *USA Today* journalist to describe Apple's agreement with AT&T as "an easy way to handcuff rivals and steal customers."

16

**G.    Defendants Quickly Faced Unwanted Competition in the iPhone Aftermarket**

64.    Almost immediately after the iPhone was launched, Third Party Apps for the iPhone started to appear that generated competition for Apple in the applications aftermarket and for AT&T in the cellular voice and service aftermarket. For example, Mobile Chat and FlicklM gave iPhone users access to instant messaging programs from which Apple derived no revenues.

65.    Even more significantly, Apple faced competition in the iPhone ring tone aftermarket. When a customer purchases a song for $1 from the iTunes store, Apple charges the customer an additional 99 cents to convert any portion of that song into a ring tone. A number of competing programmers promptly offered a variety of ring tone programs that worked on the iPhone, which consumers were able to download both for a fee and for free. Some of these programs allowed customers to use samples of popular songs lawfully downloaded from Apple's iTunes store as a ring tone for their iPhone. Other programs, such as I-Toner from Ambrosia Software, and iPhone RingToneMaker from Efiko software, allowed customers to "clip" portions of songs purchased by them from iTunes for use as ring tones.

66.    Since many of these programs used songs downloaded from iTunes, Apple initially sought to block the use of those songs as ring tones by updating the iTunes software to install Program Locks that would interfere with such use. However, those efforts were all quickly defeated by third party programmers, sometimes within hours of the release of the update.

67.    The availability of Third Party Apps for iPhones reduced Apple's share of the iPhone aftermarket for ring tones and other applications and greatly reduced or threatened to reduce Apple's expected supracompetitive revenues and profits in that aftermarket.

68.    Unlocking of the SIM card took a little longer and was more complicated. Initially some customers sought to evade the program lock by altering the hardware. In August 2007, a

17

high-school student announced the first "hardware unlocked" iPhone on YouTube. Shortly thereafter, software unlocks were developed and an explosion of unlock solutions, both free and for a fee, appeared on the Internet. Many of the solutions involved a small change in the software, in some cases in as little as two bytes of code.

69.    The availability of SIM card unlocking solutions enabled iPhone customers to lawfully terminate their AT&T voice and data service contracts if they were unhappy with AT&T's service and switch to T-Mobile in the United States, and it enabled iPhone customers to avoid AT&T's excessive international roaming charges by replacing the AT&T SIM card with a local GSM carrier's SIM card while traveling.

70.    The availability of SIM card unlocking solutions reduced AT&T and Apple's share of the iPhone voice and data services aftermarket and greatly reduced or threatened to reduce the supracompetitive revenues and profits they had agreed to share.

## H.    Defendants' Unlawful Retaliation in Response to the Unwanted Competition

### 1.    Apple's breaches of warranty

71.    To protect Defendants' positions in the iPhone aftermarket for voice and data services and for ring tone and other software applications, Apple repeatedly announced that any attempt to unlock the iPhone SIM or to install Third Party Apps would void the Apple warranty. This assertion was false as a matter of federal law, and was known by Apple to be false when made. The Federal Magnuson-Moss Warranty Act prohibits conditioning the iPhone warranty on the use of Apple products only, or on the use of AT&T service only, 15 USCS § 2302(c), which is effectively what the Apple's warranty announcements did.

72.    When Apple's warranty announcements did little to stem the tide of unlock solutions being offered in the summer of 2007, Apple announced that use of Third Party Apps or

unlocking the AT&T SIM card might cause the iPhone to become unusable. At that time Apple had no reason to believe that statement was true, and, in fact, users who unlocked their iPhones or installed Third Party Apps had complete functionality. The computer community thought that Apple was intentionally spreading misinformation (known in the jargon of that community as "FUD," or "Fear, Uncertainty and Despair") to scare iPhone users into not making lawful alterations to unlock the SIM cards or lawfully installing new Third Party Apps.

**2.    Apple's malicious destruction of iPhones and Defendants' refusal to fix them**

73.    When Apple's other efforts to prevent competition in the iPhone aftermarket failed, Apple decided to punish iPhone customers who had unlocked their phones, and to deter other iPhone purchasers from unlocking their phones in the future, by planting a malicious code in an iPhone operating system "upgrade" called Version 1.1.1 that damaged or destroyed the handsets of iPhone customers who had unlocked a SIM card or installed a Third Party App.

74.    Apple acted deliberately and intentionally to destroy the iPhones of consumers who had lawfully unlocked their iPhones. Apple's willful destruction is revealed by a press release Apple issued on September 24, 2007 (the "September 24 Press Release"), three days before it released Version 1.1.1.

75.    The September 24 Press Release stated:

Apple has discovered that many of the unauthorized iPhone unlocking programs available on the Internet cause irreparable damage to the iPhone's software, *which will likely result in the modified iPhone becoming permanently inoperable when a future Apple-supplied iPhone software update is installed.* ... Apple strongly discourages users from installing unauthorized unlocking programs on their iPhones. Users who make unauthorized modifications to the software on their iPhone violate their iPhone software licensing agreement and void their warranty. *The permanent inability to use an iPhone due to installing unlocking software is not covered under the iPhone's warranty.*

(emphases added)

76.    Before September 24, 2007, few if any iPhone users reported any problems resulting from unlocking their iPhones, much less the handsets "bricking" or otherwise becoming "permanently inoperable." Yet Apple was able to predict in its September 24 Press Release that such problems would begin to occur *after* Version 1.1.1 was released. Apple's statement that the existence of unlock codes would *"likely result in the modified iPhone becoming permanently inoperable when a future Apple-supplied iPhone software update is installed"* unambiguously evidences that Apple *knew* Version 1.1.1 contained codes that would brick unlocked iPhones.

77.    Moreover, Apple's attempt in the September 24 Press Release to blame the "unlocking software" for the "permanent inability to use an iPhone" was a deliberately deceptive act because Apple knew it was the installation of Version 1.1.1, and not the installation of unlocking programs themselves, that would disable the iPhones.

78.    Apple's premeditated effort to disclaim warranty liability for damage that Apple knew it would itself cause to iPhones is also a deceptive act and a breach of Apple's warranty.

79.    Apple issued Version 1.1.1 on September 27, 2007. Apple had announced its operating software update was intended to make limited specific changes and improvements, including, in particular, a needed and substantial improvement to the power management and battery life of iPhone. However, instead of delivering a "patch" program altering only those specific portions of the program, Apple's upgrade was a complete new operating system that not only incorporated the improvements but also changed certain codes that were used by Third Party Apps and changed the codes necessary for the unlocked SIM cards to function.

80.    As a result of these changes, none of which were technically required for the publicly stated purposes of the upgrade but were designed solely to advance Apple's unlawful anticompetitive purposes and conduct, existing Third Party Apps were rendered useless and

existing SIM cards that were unlocked became re-locked. As Apple had planned and predicted three days earlier, in many cases the iPhones of customers who had unlocked their SIM cards or downloaded Third Party Apps were "bricked" and rendered useless when they unsuspectingly downloaded Version 1.1.1 containing Apple's secretly planted malicious codes.

81.    Both Apple and AT&T have breached their warranties by refusing to repair or replace iPhones that were damaged or rendered useless by Version 1.1.1. Apple and AT&T have also engaged in unfair and deceptive acts and practices by falsely asserting that the iPhone customer violated their licensing contracts with Apple by downloading Program Unlocks and that the customers were therefore themselves responsible for the damage to their phones.

82.    When confronted with the question of what remedy iPhone purchasers had for disabled iPhones, an Apple spokesman was quoted as saying "they can buy a new iPhone."

83.    In sum, the September 24 Press Release and surrounding circumstances reveal that Apple plainly intended to punish iPhone owners who had lawfully unlocked their iPhones by damaging their phones through Version 1.1.1 and then by unlawfully disclaiming warranty liability for the damage that Apple knew it had itself caused.

84.    Apple and AT&T's conduct was and continues to be patently illegal, and Apple and AT&T should be held fully liable, and punished, for their actions.

## CLASS ALLEGATIONS

85.    Plaintiff brings this action as a class action on behalf of himself and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis. Plaintiff's first proposed class (hereinafter the "Nationwide Class") is defined under Federal Rules of Civil Procedure 23(b)(2) and (3), and he proposes to act as a representative of the following class comprised of:

> All persons, exclusive of the Defendants and their employees, who purchased an iPhone from Apple or AT&T anywhere in the United States between June 29, 2007 (or the actual date that the iPhone became available) through such time in the future when the effects of Defendants' violations of the federal antitrust laws and the Magnuson-Moss Warranty Act, and Apple's trespass to chattels, as alleged herein have ceased.

86.    Plaintiff's second proposed class (hereinafter the "Consumer Protection Class") is defined under Federal Rules of Civil Procedure 23(b)(2) and (3), and he proposes to act as a representative of the following class comprised of:

> All persons, exclusive of the Defendants and their employees, who purchased an iPhone from Apple or AT&T in any of the 44 jurisdictions identified in Count VI herein between June 29, 2007 (or the actual date that the iPhone became available) through such time in the future when the effects of Defendants' unfair and deceptive acts and practices alleged herein have ceased.

87.    The Classes for whose benefit this action is brought are so numerous that joinder of all members is impractical.

88.    Plaintiff is unable to state the exact number of class members without discovery of the Defendants' records but, on information and belief, states that more than 1,000,000 iPhones have already been sold and that Defendants expect several million more to be sold over the ensuing several months.

89.    There are questions of law and fact common to the Classes which predominate over any questions affecting only individual members. The common questions of law and fact affecting the rights of all members of the Classes include the following:

> a.    Whether either Defendant failed adequately to disclose to consumers the fact that the iPhones would be locked to only accept AT&T SIM cards;

> b.    Whether either Defendant failed adequately to disclose to consumers the fact that they would not provide consumers with the unlock codes for their iPhones so that the iPhones could be used with non-AT&T SIM cards;

c.     Whether either Defendant failed adequately to disclose to consumers the fact that excessive data roaming charges would apply if iPhones are taken abroad;

d.     Whether either Defendant failed adequately to disclose to consumers that Apple would seek to prohibit iPhone owners from downloading Third Party Apps;

e.     Whether either Defendant failed adequately to disclose to consumers that Apple's Version 1.1.1 would disable any Third Party Apps and SIM card unlocks or would render iPhones that contained such features inoperable;

f.     Whether Defendants' conduct in locking the iPhone to only work with AT&T SIM cards is a deceptive act and practice that violates the consumer protection statutes;

g.     Whether Defendants' refusal to give consumers the unlock code for the their iPhone is a deceptive act and practice that violates the consumer protection statutes;

h.     Whether Defendants' conduct in failing adequately to disclose to consumers the fact that excessive data roaming charges apply when the iPhone is taken abroad is a deceptive act and practice that violates the consumer protection statutes;

i.     Whether Defendants' conduct in failing adequately to disclose to consumers that Apple would seek to prohibit iPhone owners from downloading Third Party Apps is a deceptive act and practice that violates the consumer protection statutes;

j.     Whether Defendants' failure adequately to disclose to consumers that Apple's Version 1.1.1 would disable any Third Party Apps and SIM card unlocks or would render iPhones that contained such features inoperable is a deceptive act and practice that violates the consumer protection statutes;

k.     Whether Apple's design and issuance of Version 1.1.1 containing undisclosed malicious codes that disabled Third Party Apps and SIM card unlocks and rendered iPhones that contained such features inoperable is a deceptive act and practice that violates the consumer protection statutes

l.     Whether Apple's destruction of iPhones and disabling of Third Party Apps and SIM card unlocks through issuance of Version 1.1.1 breached express and implied warranties of fitness and violated the Magnuson-Moss Warranty Act;

23

m.      Whether Defendants breached express and implied warranties of fitness and violated the Magnuson-Moss Warranty Act by refusing to repair or replace iPhones that had been destroyed when their owners' downloaded Version 1.1.1;

n.      Whether Apple violated section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing or attempting to monopolize the aftermarket for iPhone software applications;

o.      Whether Defendants violated section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing, attempting to monopolize or conspiring to monopolize the aftermarket for iPhone wireless voice and data services; and

p.      Whether Apple is liable for common law trespass to chattels for damaging or destroying iPhones when it issued Version 1.1.1.

90.     Each of these enumerated commons questions of law and fact is identical for each and every member of the Classes.

91.     Plaintiff is a member of the Classes he seeks to represent, and his claims arise from the same factual and legal basis as those of the Classes; he asserts the same legal theories as do all Class members.

92.     Plaintiff will thoroughly and adequately protect the interests of the Classes, having obtained qualified and competent legal counsel to represent himself and those similarly situated.

93.     The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications and would cause needless expenditure of judicial resources.

94.     Plaintiff is typical of the Classes in that his claims, like those of the Classes, are based on the same unconscionable business practices, the same uniform omissions of material facts and the same legal theories.

95.     Defendants have acted on grounds generally applicable to the Classes.

96.    A class action is superior to all other available methods for the fair and efficient adjudication of the controversy.

## COUNT I

### Unlawful Monopolization in Violation of Sherman Act § 2
### (Seeking Damages and Equitable Relief against Defendant Apple)

97.    Plaintiffs reallege and incorporate paragraphs 1 through 96 above as if set forth fully herein.

98.    The iPhone is a unique, premium priced product that generates a unique aftermarket for services and applications that can be used only on iPhones. The price of iPhones is not responsive to an increase in iPhone service or application prices because (a) consumers who purchase an iPhone cannot at the point of sale reasonably or accurately inform themselves of the "lifecycle costs" (that is, the combined cost of the handset and its required services, parts and applications over the iPhone's lifetime), and (b) consumers are "locked into" the iPhone due to its high price tag and would incur significant costs to switch to another handset. The aftermarket for iPhone services and applications is thus an economically distinct product market, and the service and application products that are sold within that market have no acceptable substitutes. The geographic iPhone aftermarket is national.

99.    The aftermarket for iPhone services and applications have at least two analytically distinct sub-markets – (a) the aftermarket for wireless voice and data services (the "Voice and Data Services Aftermarket"), and (b) the aftermarket for software applications that can be downloaded on the iPhone for managing such functions as ring tones, instant messaging, photographic capability and Internet applications (the "Applications Aftermarket").

100.    Defendant Apple has acquired monopoly power in the iPhone Applications Aftermarket through unlawful willful acquisition or maintenance of that power. Specifically, Apple has unlawfully acquired monopoly power by (i) "approving" only applications that generate revenues for Apple; (ii) discouraging iPhone customers from using competing applications by spreading misinformation; and (iii) programming Version 1.1.1 of the iPhone operating system in a way that disabled all competitors' applications and/or destroyed the iPhones of users that had downloaded competitors' applications.

101.    Apple's unlawful acquisition of monopoly power has reduced output and competition and resulted in increased prices for products sold in the iPhone Applications Aftermarket and, thus, harms competition generally in that market.

102.    Plaintiffs have been injured in fact by Apple's unlawful monopolization because they have (a) been deprived of lower cost alternatives for applications, (b) been forced to pay higher prices for Apple "approved" applications, and/or (c) had their iPhones destroyed.

103.    Apple's unlawful monopolization of the iPhone Applications Aftermarket violates Section 2 of the Sherman Act, 15 US.C. § 2, and its unlawful monopolization practices are continuing and will continue unless they are permanently enjoined. Plaintiffs and members of the Nationwide Class have suffered economic injury to their property as a direct and proximate result of Apple's unlawful monopolization, and Apple is therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

## COUNT II

### Attempted Monopolization in Violation of Sherman Act § 2
### (Seeking Damages and Equitable Relief against Defendant Apple)

104.    Plaintiffs reallege and incorporate paragraphs 1 through 103 above as if set forth fully herein.

105.    Defendant Apple has engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the iPhone Applications Aftermarket. Specifically, Apple has attempted unlawfully to acquire monopoly power by (i) "approving" only applications that generate revenues for Apple; (ii) discouraging iPhone customers from using competing applications by spreading misinformation; and (iii) programming Version 1.1.1 of the iPhone operating system in a way that disabled all competitors' applications and/or destroyed the iPhones of users that had downloaded competitors' applications. Apple did not have a legitimate business justification for any of these actions.

106.    Apple's anticompetitive actions have created a dangerous probability that Apple will achieve monopoly power in the Applications Aftermarket because Apple has already unlawfully achieved an economically significant degree of market power in that market and has effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

107.    Apple's attempted acquisition of monopoly power has reduced output and competition and resulted in increased prices for products sold in the iPhone Applications Aftermarket and, thus, harms competition generally in that market.

27

108.    Plaintiffs have been injured in fact by Apple's attempted monopolization because they have (a) been deprived of lower cost alternatives for applications, (b) been forced to pay higher prices for Apple "approved" applications, and/or (c) had their iPhones destroyed.

109.    Apple's attempted monopolization of the iPhone Applications Aftermarket violates Section 2 of the Sherman Act, 15 US.C. § 2, and its anticompetitive practices are continuing and will continue unless they are permanently enjoined.  Plaintiffs and members of the Nationwide Class have suffered economic injury to their property as a direct and proximate result of Apple's attempted monopolization, and Apple is therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

### COUNT III

### Unlawful Monopolization in Violation of Sherman Act § 2
### (Seeking Damages and Equitable Relief against Both Defendants)

110.    Plaintiffs reallege and incorporate paragraphs 1 through 109 above as if set forth fully herein.

111.    Apple and AT&T's revenue sharing arrangement with respect to AT&T's exclusive five-year iPhone voice and data services contract renders both Defendants participants in the iPhone Voice and Data Services Aftermarket.

112.    Defendants have acquired monopoly power in the iPhone Voice and Data Services Aftermarket through unlawful willful acquisition or maintenance of that power. Specifically, Defendants have unlawfully acquired monopoly power by (i) discouraging iPhone customers from unlocking their SIM cards through misinformation campaigns; (ii) programming Version 1.1.1 of the iPhone operating system in a way that disabled all SIM card unlocks and/or

28

destroyed the iPhones of users that had unlocked their SIM cards; and (iii) refusing to honor the iPhone warranty for users who unlocked their SIM cards.

113.    Defendants' unlawful acquisition of monopoly power has reduced output and competition in the iPhone Voice and Data Services Aftermarket and, thus, harms competition generally in that market.

114.    Plaintiffs have been injured in fact by Defendants' unlawful monopolization because they have (a) been deprived of alternatives for voice and data services domestically, (b) been forced to pay higher prices for roaming charges while traveling internationally, and/or (c) had their iPhones destroyed.

115.    Defendants' unlawful monopolization of the iPhone Voice and Data Services Aftermarket violates Section 2 of the Sherman Act, 15 US.C. § 2, and their unlawful monopolization practices are continuing and will continue unless they are permanently enjoined. Plaintiffs and members of the Nationwide Class have suffered economic injury to their property as a direct and proximate result of Defendants' unlawful monopolization, and Defendants are therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

## COUNT IV

### Attempted Monopolization in Violation of Sherman Act § 2
### (Seeking Damages and Equitable Relief against Both Defendants)

116.    Plaintiffs reallege and incorporate paragraphs 1 through 115 above as if set forth fully herein.

117.    Defendants have engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the iPhone Voice and Data Services Aftermarket. Specifically, Defendants have attempted unlawfully to acquire monopoly power by (i)

discouraging iPhone customers from unlocking their SIM cards through misinformation campaigns; (ii) programming Version 1.1.1 of the iPhone operating system in a way that disabled all SIM card unlocks and/or destroyed the iPhones of users that had unlocked their SIM cards; and (iii) refusing to honor the iPhone warranty for users who unlocked their SIM cards. Defendants did not have a legitimate business justification for any of these actions.

118.    Defendants' anticompetitive actions have created a dangerous probability that they will achieve monopoly power in the Voice and Data Services Aftermarket because Defendants have already unlawfully achieved an economically significant degree of market power in that market and have effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

119.    Defendants' attempted acquisition of monopoly power has reduced output and competition and resulted in increased prices for products sold in the iPhone Voice and Data Services Aftermarket and, thus, harms competition generally in that market.

120.    Plaintiffs have been injured in fact by Defendants' attempted monopolization because they have (a) been deprived of alternatives for voice and data services domestically, (b) been forced to pay higher prices for roaming charges while traveling internationally, and/or (c) had their iPhones destroyed.

121.    Defendants' attempted monopolization of the iPhone Voice and Data Services Aftermarket violates Section 2 of the Sherman Act, 15 US.C. § 2, and their anticompetitive practices are continuing and will continue unless they are permanently enjoined. Plaintiffs and members of the Nationwide Class have suffered economic injury to their property as a direct and proximate result of Defendants' attempted monopolization, and Defendants are therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

## COUNT V

### Conspiracy to Monopolize in Violation of Sherman Act § 2
### (Seeking Damages and Equitable Relief against Both Defendants)

122.    Plaintiffs reallege and incorporate paragraphs 1 through 121 above as if set forth fully herein.

123.    Defendants have knowingly and intentionally conspired among themselves with the specific intent to monopolize the iPhone Voice and Data Services Aftermarket. In furtherance of the conspiracy, Defendants have committed one or more of the following acts: (i) discouraging iPhone customers from unlocking their SIM cards through misinformation campaigns; (ii) programming Version 1.1.1 of the iPhone operating system in a way that disabled all SIM card unlocks and/or destroyed the iPhones of users that had unlocked their SIM cards; and (iii) refusing to honor the iPhone warranty for users who unlocked their SIM cards. Defendants did not have a legitimate business justification for any of these actions.

124.    Defendants have already unlawfully achieved an economically significant degree of market power in the Data Services Aftermarket as a result of their conspiracy and have effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

125.    Defendants' conspiracy has reduced output and competition and resulted in increased prices for products sold in the iPhone Voice and Data Services Aftermarket and, thus, harms competition generally in that market.

126.    Plaintiffs have been injured in fact by Defendants' conspiracy because they have (a) been deprived of alternatives for voice and data services domestically, (b) been forced to pay

31

higher prices for roaming charges while traveling internationally, and/or (c) had their iPhones destroyed.

127.    Defendants' conspiracy to monopolize the iPhone Voice and Data Services Aftermarket violates Section 2 of the Sherman Act, 15 U.S.C. § 2, and their anticompetitive practices are continuing and will continue unless they are permanently enjoined.  Plaintiffs and members of the Nationwide Class have suffered economic injury to their property as a direct and proximate result of Defendants' conspiracy, and Defendants are therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

## COUNT VI

### Unfair and Deceptive Acts and Practices
**(Seeking Damages and Equitable Relief against Both Defendants)**

128.    Plaintiffs reallege and incorporate paragraphs 1 through 127 above as if set forth fully herein.

129.    The consumer protection and unfair and deceptive trade practices laws of 44 jurisdictions in the United States prohibit deceptive acts or practices in the conduct of any business trade or commerce or in the furnishing of any service[5] and authorize a private right of action against defendants that violate those laws.

---

[5] The state statutes Defendants are alleged to have violated are: **Alaska** (Alaska Stat. §§ 45.50.471 *et seq.*); **Arizona** (Ariz. Rev. Stat. § 44-1522); **Arkansas** (Ark. Code. §§ 4-88-107 and 4-88-108); **California** (Cal. Civ. Code § 1770(a)(19) and Cal. Bus. & Prof. Code §§ 17200 and 17500); **Colorado** (Colo. Rev. Stat. § 6-1-105(u)); **Connecticut** (Conn. Gen. Stat. § 42-110(b); **Delaware** (6 Del. Code § 2513); **District of Columbia** (D.C. Code § 28-3904(e),(f)); **Florida** (F.S.A. § 501.204); **Hawaii** (Haw. Rev. Stat. § 480-2(a)); **Idaho** (Idaho Code § 48-603(17),(18)); **Illinois** (815 Ill. Comp. Stat. 505/2); **Indiana** (Ind. Code § 24-5-0.5-3(a)); **Kansas** (Kan. Stat. §§ 50-626(a),(b) and 50-627(a)); **Kentucky** (Ky. Rev. Stat. § 367.170); **Maine** (Me. Rev. Stat. tit. 5, § 207); **Maryland** (Md. Code Com. Law § 13-301(1),(3)); **Massachusetts** (Mass. Gen. Laws ch. 93A, §§ 2(a) and 9); **Michigan** (Mich. Stat. § 445.903(1)(s),(bb),(cc));

130.    Defendants sold iPhones to consumers in these 44 jurisdictions without disclosing the fact (a) that the handsets had been locked to only work with AT&T SIM cards; (b) that Defendants would not provide the unlock code to consumers; (c) that consumers would incur substantial roaming fees for the use of the iPhone's data features while traveling internationally; (d) that Apple would seek to prohibit iPhone owners from downloading Third Party Apps; (e) that Apple had embedded malicious codes within Version 1.1.1 that would disable any SIM card unlocks or Third Party Apps and/or "brick" any iPhone that had been unlocked or had Third Party Apps installed; and (f) that Defendants would refuse to honor the iPhone warranty or repair or replace iPhones that had been destroyed when their owners downloaded Version 1.1.1.

131.    Defendants' conduct described above is deceptive and misleading in material respects. Defendants, to the extent required under the laws of any jurisdiction, have made misrepresentations and acted unconscionably in connection with the marketing and sale of Apple iPhones and related aftermarket services, including AT&T's iPhone voice and data service plans.

132.    Defendants' acts and practices described above are likely to mislead a reasonable consumer acting reasonably under the circumstances.

---

Minnesota (Minn. Stat. §§ 8.31 and 325F.67 and 325F.69(1)); **Missouri** (Mo. Rev. Stat. § 407.020); **Nebraska** (Neb. Rev. Stat. § 59-1602); **Nevada** (NRS 598-0915(5),(15) and 598.0923(2)); **New Hampshire** (N.H. Rev. Stat. § 358-A:2); **New Jersey** (N.J.S.A. § 56:8-2); **New Mexico** (N.M.S.A. §§ 57-12-2(14),(17) and 57-12-3); **New York** (N.Y. Gen. Bus. Law § 349); **North Carolina** (N.C. Gen. Stat. §§ 75-1.1); **North Dakota** (N.D. Cent. Code §§ 51-15-02); **Ohio** (Ohio Rev. Code §§ 1345-02(A) and 1345-03(A) and 4165.02(7),(11) and §4165.03); **Oklahoma** (Okla. Stat. tit. 15, §§ 752 and 733 and tit. 78, § 53(9)); **Oregon** (Or. Rev. Stat. §§ 646.607(1) and 646.608(1)(i),(t),(u) and 646.608(2)); **Pennsylvania** (73 P.S. §201-2(1)(ix), 201-2(4)(xiv)); **Rhode Island** (R.I. Gen. Laws §§ 6-13.1-1(6)(ix),(xiii),(xiv) and 6-13.1-2; **South Dakota** (S.D. Codified Laws § 37-24-6(1)); **Tennessee** (Tenn. Code Ann. § 47-18-104(a)); **Texas** (Tex. Bus. & Com. Code Ann. §§ 17.46(b)(9),(24) and 17.50); **Utah** (UCA 1953 §§ 13-11-4(1) and 13-11-5(1)); **Vermont** (Vt. Stat. Ann. tit. 9, § 2453(a)); **Virginia** (Va. Code Ann. § 59.1-200(8),(14)); **Washington** (RCWA §§ 19.86.020 and 19.86.920); **West Virginia** (W.Va. Code §§ 46A-6-102(b)(I),(L),(M) and 46A-6-104); **Wisconsin** (W.S.A. §§ 100.18 and 100.195 and 100.20 and 100.207); and **Wyoming** (WS § 40-12-105(a)(x),(xv)).

133.    As a result of the Defendants' deceptive and misleading acts, Plaintiff and class members have been injured.  To the extent necessary under the laws of any jurisdiction, Plaintiff has provided Defendants with notice and an opportunity to cure their misleading and deceptive acts and practices and have sought to settle and resolve this dispute.

134.    Defendants' conduct violates the consumer protection and unfair and deceptive acts and practices laws of each of the 44 jurisdictions at issue, and their deceptive acts and practices are continuing and will continue unless they are permanently enjoined.  Plaintiff and members of the Consumer Protection Class have suffered injury as a direct and proximate result of Defendants' conduct, and Defendants are liable for compensatory and treble or other punitive damages, costs and attorneys' fees as each respective jurisdiction may permit, in amounts to be proved at trial.

## COUNT VII

### Violation of the Magnuson-Moss Warranty Act
### (Seeking Damages and Equitable Relief against Both Defendants)

135.    Plaintiffs reallege and incorporate paragraphs 1 through 134 above as if set forth fully herein.

136.    Defendant Apple violated the iPhone warranty under the Magnuson-Moss Warranty Act ("MMWA") by conditioning its written and implied warranties of that product on consumers using, in connection with such product, articles or services (other than articles or services provided without charge under the terms of the warranty), which are identified by brand, trade, or corporate name, including AT&T's voice and data service and the software applications "approved" by Apple.

137.    Defendants Apple and AT&T violated the iPhone warranty under the MMWA by not fully and conspicuously disclosing the characteristics or properties of the products, or parts thereof, that are not covered by the warranty, namely, by not fully and conspicuously disclosing that they would not honor the warranty as to iPhones that were damaged and destroyed by Apple's Version 1.1.1 operating system upgrade.

138.    Plaintiff has provided Defendants with reasonable notice and an opportunity to cure their breaches of warranty and MMWA violations.

139.    Defendants' breaches of warranty and MMWA violations are continuing and will continue unless they are permanently enjoined.  Plaintiff and members of the Nationwide Class have suffered actual damages as a direct and proximate result of Defendants' breaches of warranty and MMWA violations, and Defendants are liable for compensatory damages and costs in amounts to be proved at trial.

## COUNT VIII

### Trespass to Chattels
### (Seeking Damages and Equitable Relief against Apple)

140.    Plaintiffs reallege and incorporate paragraphs 1 through 139 above as if set forth fully herein.

141.    Apple's conduct in causing Version 1.1.1 of its operating software to (a) damage or brick iPhones; (b) disable existing SIM card unlocks; (c) disable existing Third Party Apps; (d) alter the product owned by Plaintiff and the class members to create technological impediments to unlocking SIM cards; and (e) alter the product owned by Plaintiff and the class members to create technological impediments to the purchase of Third Party Apps, were

alterations that Plaintiff and the class members did not want nor invite, and they were not made with any purpose other than to benefit Apple in continuing its unlawful conduct described above.

142.    Apple's unwanted and uninvited intermeddling with the iPhone operating software is an actual or intended trespass to property owned by Plaintiff and each class member.

143.    Apple acted knowingly, willfully and maliciously, and with reckless, callous and criminal indifference to and disregard for the rights of others.

144.    Defendant's trespass is continuing and will continue unless Apple is permanently enjoined.  Plaintiff and members of the Nationwide Class have suffered injury as a direct and proximate result of Apple's conduct, and Apple is liable for compensatory and punitive damages and costs in amounts to be proved at trial.

WHEREFORE, Plaintiff respectfully requests that the court enter judgment against the Defendants as follows:

a.    Permanently enjoining Defendants from damaging and destroying iPhones through software updates or otherwise;

b.    Ordering Defendants to repair or replace, at no cost to the consumer, all iPhones Defendants have damaged or destroyed;

c.    Permanently enjoining Defendants from selling locked iPhones that can only be used with AT&T SIM cards unless such information is adequately disclosed to consumers prior to sale;

d.    Ordering Defendants to provide the unlock code upon request to all members of the Classes who purchased an iPhone prior to the disclosures described above;

e.    Ordering Defendants to adequately disclose the extent to which fees are charged for taking or using iPhones while traveling abroad;

f.    Permanently enjoining Apple from monopolizing or attempting to monopolize the iPhone Applications Aftermarket;

g.    Permanently enjoining Defendants from monopolizing, attempting to monopolize and conspiring to monopolize the iPhone Voice and Data Services Aftermarket;

h.    Awarding Plaintiff and the Nationwide Class treble damages for injuries caused by Defendants' violations of the federal antitrust laws;

i.    Permanently enjoining Defendants from engaging in unfair and deceptive practices with respect to iPhones in violation of the consumer protection statutes;

j.    Awarding Plaintiff and the Consumer Protection Class compensatory and punitive damages for injuries caused by Defendants' deceptive acts and practices;

k.    Permanently enjoining Defendants from violating the Magnuson-Moss Warranty Act and breaching their express and implied warranties of fitness;

l.    Awarding Plaintiff and the Nationwide Class compensatory damages for injuries caused by Defendants' violations of the Magnuson-Moss Warranty Act and breaches of their express and implied warranties of fitness;

m.    Permanently enjoining Apple from trespassing on class members' iPhones through future software updates or otherwise;

n.    Awarding Plaintiff and the Nationwide Class compensatory and punitive damages for Apple's trespass to chattels;

o.    Award Plaintiff and the classes reasonable attorneys' fees and costs; and

p.    Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

37

Dated:  New York, New York
       November 16, 2007

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

By: _____

      Mark C. Rifkin (MR-0904)
      Alexander H. Schmidt (AS-8304)
      Martin E. Restituyo (MR-0856)
270 Madison Avenue
New York, New York 10016
(212) 545-4600

Randall S. Newman (RN-7862)
Randall S. Newman, P.C.
The Trump Building
40 Wall Street, 61st Floor
New York, New York 10005
(212) 797-3737

Stephen P. DeNittis
Norman Shabel
*Pro Hac Vice Application Pending*
Shabel & DeNittis, P.C.
5 Greentree Centre, Suite 302
Marlton, New Jersey 08053
(856) 797-9951

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HERBERT H. KLIEGERMAN, on behalf of
himself and others similarly situated,

                        Plaintiff,

        - against -

APPLE, INC. and AT&T MOBILITY, LLC,

                        Defendants.

07-cv-08404-PKC

**CERTIFICATE OF SERVICE**

---

      I, Alexander H. Schmidt, an attorney at law admitted in this State, hereby certify that on

this 16th day of November, 2007, I have caused a true copy of the Amended Class Action

Complaint, filed today, to be delivered by overnight mail to:

**LATHAM & WATKINS, LLP**
Hanno F. Kaiser
855 Third Avenue
New York, New York 10036
(212) 906-1200
**Counsel for Defendant**
**Apple, Inc.**

**AT&T MOBILITY LLC**
Neil Berinhout
5565 Glenridge Connector, Suite 1700
Atlanta, Georgia 30342
(courtesy copy)
**Counsel for Defendant**
**AT&T Mobility, LLC**

                                _Alexander H. Schmidt_

                                Alexander H. Schmidt (AS-8304)